IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    v.                             :   CRIMINAL NO. 16-273

GEORGE BARNARD                    :

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant George Barnard seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the economic danger that the defendant presents to the community, the fact that he does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic, the fact that his medical conditions are well controlled with treatment in BOP custody, and the fact that he has served only approximately 38% of the 60-month sentence imposed by the Court. This Court should exercise its discretion and deny the motion.

**I.      Background.**

Defendant George Barnard engaged in a years-long series of fraud schemes designed to provide him with the trappings of wealth – multi-million dollar luxury beach homes in Avalon, yachts, nice cars, a suite at the Wells Fargo Center, and his own businesses that he ran, including a mortgage company, Capital Financial Mortgage Corp.

("CFMC") and numerous title companies. The defendant's offense conduct, which is summarized at paragraphs 15 through 98 of the presentence report, is egregious. The defendant's multiple fraud schemes went on for over seven years – starting sometime prior to December 2005 and ending in March 2013. During this period of time, the defendant defrauded numerous lenders – lenders who loaned money to CFMC, lenders who bought mortgages written by CFMC, and lenders who loaned the defendant himself millions of dollars to buy his luxury beach homes and yachts. *See* PSR ¶¶ 15-81. When the defendant's schemes came crashing down, these lenders had collectively lost $12,774,941.89 – which is the *actual* loss caused by the defendant's conduct (and which does not include ancillary costs like attorneys' fees or interest). *See* PSR ¶ 94.

In addition to defrauding all of these lenders, the defendant also defrauded the IRS when he filed blatantly false tax returns that failed to declare millions of dollars in income and resulted in a total tax loss of at least $954,633. PSR ¶¶ 82-89.

Lastly, the defendant harmed over two dozen individual borrowers who turned to CFMC to obtain a refinance mortgage who suddenly found their homes encumbered by not one but two separate mortgages after the defendant failed to pay off their existing mortgages and then sold their new mortgages to other lenders. PSR ¶ 91. These borrowers turned to CFMC to obtain refinance loans so they could pay off their existing mortgages and get new loans at better rates. They had no idea that the defendant was running a series of fraud schemes. They had no idea that the defendant had a multi-million-dollar deficit in his title insurance escrow accounts. They had no idea that when they signed their loan documents, CFMC was not repaying the outstanding first

mortgages as shown on their HUD-1 settlement statements and was instead using their loan proceeds to pay off older mortgages for other customers. They had no idea that CFMC was selling their new mortgages to other lenders that were promptly recording them. They had no idea that instead of getting new and better mortgages, they now had two mortgages on their homes. The defendant knew all of this, yet did what he did anyway because he had dug himself a massive hole and was willing to leave these borrowers stuck with two mortgages if that is what it took to dig himself out of the hole.

Simply put, the defendant engaged in a massive fraud over years for personal profit. He reaped the benefits of that fraud, and he went to great lengths to cover it up. As set forth in the presentence report, the defendant lied to his Title Insurance Underwriters to stall an audit. PSR ¶ 31. He opened numerous title insurance companies to use whenever the escrow account deficit in one company's account became unmanageable, and then simply rolled the deficit over to the new company. *See* PSR ¶¶ 18-19. Eventually, he even brought in the unsuspecting owner of a separate title insurance company, gained access to the funds advanced to that title insurance company by creating false wiring instructions, and spent that money too. *See* PSR ¶¶ 19, 33-39.

In advance of sentencing, the government asked the Court to impose a sentence of 97 months, which was the low end of the advisory guidelines range. Docket # 47. In imposing sentence, Chief Judge Stengel varied downward in light of the defendant's bipolar disorder and sentenced the defendant to 60 months' incarceration. *See* Docket #s 53, 56.

- 3 -

Against this backdrop, and having served only approximately 38 percent of the sentence imposed, he now asks for compassionate release. Barnard is serving his sentence at FPC Montgomery, with a projected release date of December 19, 2021.[1] He has not committed any disciplinary infraction during his time in custody.

**B.      Request for Compassionate Release.**

On April 23, 2020, Barnard submitted a written request to his case manager for compassionate release, in which he asserted that he suffered from a blood disorder and mental health issues. Defendant's Exhibit A at p.12. That request was denied, on the ground that at that time, Barnard had completed only 32% of his sentence. *Id.* Barnard filed his motion for release before this Court on August 4, 2020, in which he asserts different grounds than previously submitted to BOP, specifically that he should be released from prison on compassionate grounds because he is a "'chronic care 2' level inmate with preexisting diseases of liver disease, hypertension and a hemoglobin disorder." Motion at p.3.

While Barnard makes these claims in his motion, Barnard did not actually file his medical records with this Court to back up these claimed medical issues. Instead, he filed other documents under seal, such as his communications with Health Services, in which he refers to his supposed medical conditions of "liver disease," "pulmonary hypertension," and "overload of iron in my blood." *See, e.g.,* Defendant's Exhibit A at

---

[1] The defendant's release date takes into account a reduction of 12 months due to his completion of the BOP's Residential Drug Abuse Program ("RDAP").

p.17. The government has obtained Barnard's medical records,[2] and the undersigned has reviewed those records. These records do not reflect that Barnard has "pulmonary hypertension" or any other condition that is recognized by the CDC as placing the defendant at greater risk of complications were he to contract COVID-19.

As the defendant's medical records make clear, he does suffer from bipolar disorder. *See, e.g.,* Government's Exhibit 1 at p.4, 22, 23. He also has presented with chronic shoulder pain. *See, e.g.,* Government's Exhibit 1 at pp.10, 17, 31. In addition, there are numerous notations referring to the defendant's chronic alcohol abuse and withdrawal. *See, e.g.,* Government's Exhibit 1 at pp. 113, 115, 143.

Notably, there is no diagnosis of "pulmonary hypertension" as defendant claims, although there are references to "hypertension" and "essential (primary) hypertension." *See, e.g.,* Government's Exhibit 1 at pp.45, 50. Primary, or essential hypertension, is merely high blood pressure. *See, e.g.,* https://www.webmd.com/hypertension-high-blood-pressure/qa/what-is-essential-or-primary-hypertension. This is distinct from "pulmonary hypertension," which is a specific type of high blood pressure that affects the arteries in a person's lungs and the right side of the heart. *See, e.g.,* https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697; https://www.webmd.com/lung/pulmonary-arterial-hypertension. While pulmonary hypertension is recognized by CDC as a high risk factor, regular or essential (primary) hypertension, is not. Moreover, the defendant's medical records

---

[2] The government is filing these medical records under seal concurrently herewith as Government Exhibits 1 and 2.

reflect that his hypertension was listed as "resolved" on September 17, 2019. Government's Exhibit 1 at p.259.

There are also preliminary diagnoses in the defendant's medical records of "hemochromatosis," which is a hereditary disorder in which iron salts are deposited in the tissues, which could lead to liver damage, diabetes mellitus, and bronze discoloration of the skin. *See, e.g.,* Government Exhibit 1 at pp.74, 81; https://www.mayoclinic.org/diseases-conditions/hemochromatosis/symptoms-causes/syc-20351443. Notably, hemochromatosis is not a recognized CDC high risk factor.

While the defendant claims he is in "chronic care level 2" due to liver disease, the government could find nothing in his records to reflect this. The government did note several "assessments" of "liver disease, unspecified," in the defendant's medical records. *See, e.g.,* Government Exhibit 1 at pp.98, 122, and Exhibit 2 at p.98. In addition, the defendant had a recent liver exam on May 26, 2020, which found "mild increased hepatic echogenicity, as can be identified with fatty infiltration or chronic liver disease." Government's Exhibit 2 at p.150.

The defendant's medical conditions appear well-controlled at this time with medication provided by the institution. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs). He does not assert differently in his motion.

### C.     BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in

massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms, and also placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, all facility staff are screened for symptoms, through daily temperature checks and mandatory self-reporting of symptoms.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent

authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are very limited, but permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under

the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, since March 26, BOP has transferred a total of 7,504 inmates to home confinement.[3]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

---

[3] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

BOP's aggressive efforts have been successful thus far at FPC Montgomery. That institution houses 429, and has not reported any positive case of COVID-19 in the inmate population throughout the five months of this crisis.

## II.    Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is

- 11 -

binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[4]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community],

---

[4] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A)     Medical Condition of the Defendant.—

      (i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

      (ii)     The defendant is—

            (I)     suffering from a serious physical or medical condition,

            (II)     suffering from a serious functional or cognitive impairment, or

            (III)     experiencing deteriorating physical or mental health because of the aging process,

            that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)     Family Circumstances.—

      (i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

      (ii)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)     Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason

- 13 -

other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The defendant is not eligible for compassionate release, because he does not present an "extraordinary and compelling reason" as stated in the governing guideline policy statement. The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.*

at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The defendant asserts, however, that he suffers from liver disease, pulmonary hypertension, and a blood disorder. The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. But the defendant presents no such condition. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 2020 WL 1627331, at *20 (W.D. Pa. May 29, 2020)).

On June 25, 2020, the CDC, on the basis of extensive available data, revised its list of high-risk factors. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html? As stated above, the defendant does not suffer from any conditions that are deemed by the CDC to be "high-risk" factors.[5]

In addition to the "high-risk" factors, the CDC also reports a longer separate list for which there is insufficient data to conclude anything other than that these conditions "might" put a person at risk. High blood pressure (hypertension) and liver disease, which Barnard claims he has, are on this list of conditions that the CDC believes "might" put a person at risk. In the government's view, however, inmates with such conditions do not present an extraordinary basis for relief.

Turning first to hypertension, significantly, while Barnard alleges that he suffers from pulmonary hypertension, his records do not support this allegation and instead show, at most, that he had some instances of high blood pressure. High blood pressure (hypertension) is distinctly different from pulmonary hypertension.

The CDC asserts: "Although many patients with severe illness from COVID-19 have underlying hypertension, it is unclear at this time if hypertension is an independent risk factor for severe illness from COVID-19. Hypertension is common in the United States. Hypertension is more frequent with advancing age and among men, non-Hispanic blacks, and people with other underlying medical conditions such as obesity, diabetes, and serious heart disease. At this time, people whose only underlying medical condition

---

[5] At present, the CDC has identified the following high-risk factors: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); immunocompromised state (weakened immune system) from solid organ transplant; obesity (BMI of 30 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; and type 2 diabetes mellitus.

is hypertension are not considered to be at higher risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Hypertension , last accessed August 1, 2020.

A vast number of courts have accordingly denied relief in recent months when hypertension is the only putative risk factor presented. *See, e.g.*, *United States v. Nesbitt*, 2020 WL 3412577, at *4 (E.D. Pa. June 22, 2020) (Bartle, J.) (ordinary hypertension does not justify release); *United States v. Tartaglione*, 2020 WL 3969778, at *6 (E.D. Pa. July 14, 2020) (Slomsky, J.) (hypertension and hyperthyroidism, if presented by 64-year-old, "are not the kind of conditions that place her at a uniquely high risk of grave illness or death if infected by COVID-19."); *United States v. Carter*, 2020 WL 4194014, at *2 (S.D. Ga. July 21, 2020) (hypertension is not sufficient; "at this point, the Court cannot conclude that the 'might' category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself."); *United States v. Thomas*, 2020 WL 3895781, at *3 (W.D. Va. July 10, 2020) ("During the pandemic, courts in this district and across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions."); *United States v. Colbert*, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020) ("Hypertension, a condition that affects about 46% of the U.S. adult population, high cholesterol, and having had prostate cancer in the past are not 'extraordinary and compelling' conditions."); *United States v. Wood*, 2020 WL 3162944, at *2 (E.D. Tenn. June 12, 2020) (hypertension is not a risk factor; "While the Court sympathizes with Mr. Wood's concerns, it is unwilling to order the release of prisoners whose underlying conditions,

based on the CDC's guidelines, do not place them at a greater risk of severe illness from COVID-19; otherwise, the Court, to be evenhanded, would face the untenable situation of having to release all prisoners with any underlying condition.").

With respect to his liver condition, there is no evidence that Barnard's liver condition is anything other than mild, and it appears to be well managed by BOP.

On this record, Barnard does not present an "extraordinary and compelling reason" allowing consideration for compassionate release. And even if he did, relief should be denied. This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, his medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, he continues to present an economic danger to the community, and should be required to serve the sentence that this Court imposed for his criminal conduct. The defendant is a sophisticated fraudster who defrauded lenders out of millions of dollars to fund a lavish lifestyle, for which he received a sentence of only 60 months due largely to the sentencing court's consideration of his bipolar disorder.

The defendant fails to demonstrate how release at this time, after serving only 38% of a five-year sentence, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). Instead, his motion ignores these factors, and instead consists of little more than a recitation of his medical conditions and the fear of COVID-19 to justify his release. A

- 18 -

consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical conditions, and the amount of time remaining on the defendant's sentence. Indeed, recently, Chief Judge Sanchez's denial of a request for compassionate release on the grounds that the defendant had only served 19 months out of a 180-month sentence was affirmed by the Third Circuit. *See United States v. Pawlowski*, -- F.3d --, 2020 WL 4281503 (3d Cir. June 26, 2020) (Danbury inmate was eligible for consideration, as he suffers from hypertensive heart disease, COPD, dyspnea (shortness of breath), and sleep apnea, and has only one lung as a result of a pulmonectomy, putting him at risk from COVID-19, but the district court did not abuse its discretion in concluding that release, after only 19 months of a 180-month term for public corruption, is not warranted under the 3553(a) factors; the court properly relied on the limited time served, the seriousness of the crime (political corruption), and the sentencing disparity with a co-defendant's sentence that would result if the defendant were released), *affirming United States v. Pawlowski*, 2020 WL 2526523, at *4 (E.D. Pa. May 18, 2020).

        To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and

"abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Jepsen*, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) ("Mr. Jepsen is in the unique position of having less than eight weeks left to serve on his sentence, he is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19, and the Government consents to his release."); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (31-year-old man is obese and suffers from hypertension and diabetes; four months remaining on sentence); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense); *United States v. Sedge*, 2020 WL 2475071 (E.D.N.Y. May 13, 2020) (released with 8 months remaining on 72-month drug sentence, due to "hypertension, hyperlipidemia and coronary artery disease, family medical history, and the rapid rise of COVID-19 infections at FCI Danbury."); *United States v. Rodriguez*, 2020 WL 3051443 (S.D.N.Y. June 8, 2020) (granted due to "psoriatic arthritis, an autoimmune disorder for which he is prescribed an immunosuppressant that weakens his body's ability to fight infections," and asthma; has only seven months left to serve on 60-month term); *United States v. Moore*, 2020 WL 2572529, at *2 (D. Or. May 21, 2020) (inmate with respiratory disease released with four weeks left in 57-month 922(g) sentence); *United States v. Van Cleave*, 2020 WL 2800769 (W.D. Wash. May 29, 2020) (granted to inmate who suffers from hypothyroidism and sarcoidosis (a rare inflammatory disease that can affect multiple

- 20 -

organs of the body, most commonly the lungs), and has less than five months remaining on 20-year sentence); *United States v. Blye*, 2020 WL 3064225 (W.D. Wash. June 9, 2020) (defendant at SeaTac with respiratory issues has only five months to serve for drug offenses; he "has a lengthy and troubling criminal history," but "defendant's past offenses were almost all drug-related and non-violent, and defendant has a near-perfect prison disciplinary record."); *United States v. Kidd*, 2020 WL 3270850 (E.D. Wis. June 17, 2020) (released with two months remaining on one-year sentence for nonviolent theft offense, due to lung ailments and other conditions).

Courts have denied motions in comparable circumstances where the defendants have served only part of their sentences, and present a clear danger of continued economic harm, even where, unlike here, the inmate presents one or more definite risk factors. *See, e.g.*, *United States v. Hill*, 2020 WL 4431530 (E.D. Pa. July 31, 2020) (Kearney, J.) (57-year old presents obesity and heart disease, but he is a serial, career fraudster; relief denied with 25 months remaining on 60-month sentence); *United States v. Shulick*, 2020 WL 3250584 (E.D. Pa. June 16, 2020) (Bartle, J.) (defendant's asthma is mild, and in addition, he has served only 19 months of a 60-month sentence for a significant fraud); *United States v. Edington*, 2020 WL 2744140, at *5 (D. Colo. May 27, 2020) (explaining that during the pandemic "the danger presented to the community by the type of [financial] crimes for which Ms. Edington was sentenced is, if anything, more substantial."); *United States v. Stone*, 2020 WL 2836794, at *3 (E.D. Cal. June 1, 2020) (inmate at Lompoc (where there was huge outbreak) tested positive; but his history shows he would wreak economic havoc and not comply with health directives; he was a

disbarred attorney whose "case centered around a conspiracy to commit arson to burn down commercial buildings in order to collect insurance proceeds."); *United States v. O'Garro*, 2020 WL 3086028 (D. Conn. June 10, 2020) (court does not resolve whether condition of beta-thalassemia presents extraordinary factor, as full 78-month sentence is justified by fraud); *United States v. Moskop*, 2020 WL 1862636 (S.D. Ill. Apr. 14, 2020) (72-year-old inmate "has suffered or suffers from various acute and chronic conditions including depression, high blood pressure, high cholesterol, an enlarged prostate, hearing loss, kidney disease, bleeding on the brain, and mental deterioration," but has served less than half of a 240-month sentence for serious fraud); *United States v. Linville*, 2020 WL 3546199, at *6 (S.D. Ind. June 30, 2020) (inmate at Elkton (where there was huge outbreak) has diabetes, but he committed large fraud, was defiant toward law enforcement, "has submitted no evidence of rehabilitation, expressed no remorse for his criminal conduct, or explained his plan for what he will do if he is released."); *United States v. Barringer*, 2020 WL 2557035, at *4 (D. Md. May 19, 2020) (60 years old and presents numerous risk factors; has served 7 of 20 months of violation-of-supervised-release sentence; he committed similar financial crimes less than two years after he was released from custody, and repeatedly violated terms of supervised release; "The Court is simply not convinced that Barringer would not do so again, despite the risks of COVID-19."); *United States v. Van Sickle*, 2020 WL 2219496, at *5 (W.D. Wash. May 7, 2020) (while not yet resolving motion, the court observes that a history of fraud is a concern: "The court notes that, due to the economic impacts of the COVID-19 pandemic, large segments of the public have recently suffered severe financial setbacks, unemployment,

and other deprivations. These circumstances can lend themselves to even greater vulnerability to the very types of fraudulent schemes that Mr. Van Sickle has pursued in the past.").

Barnard is asking this Court to release him after serving only 38% of his sentence based on medical conditions that are well controlled by the BOP. In considering his motion, this Court should consider not just the fact that these conditions are well managed, but also the small percentage of the sentence served, in light of the offense conduct. Upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Michael S. Lowe*
MICHAEL S. LOWE
Assistant United States Attorney

## CERTIFICATE  OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

George Barnard
Reg. # 75406-066
FPC Montgomery
1001 Willow Street
Montgomery, AL 36112


*/s Michael S. Lowe*
MICHAEL S. LOWE
Assistant United States Attorney


Dated: August 17, 2020.